Proceed to hear argument in the last case schedule for argument on calendar today, and that is 24-5528 Harvey Yazzie v. United States Office of Navajo and Hopi Indian Relocation. And we will hear first from Mr. Malone. Good morning, Your Honors. Robert Malone, appearing for Plaintiff Appellant Harvey Yazzie, and may it please the Court. Our challenge to the hearing officer's decision in this case is, number one, to his adverse credibility findings, which are unsupported and do not comport with the repeated instruction of this circuit as to the proper procedure, legal procedure to support an adverse credibility finding. And also to what we see as just a largely circumstantial evidence by which the hearing officer tied Mr. Yazzie to Tuba City during the requisite time period. And I understand that argument. What about the argument that the officer considered the fact that the testimony was that he worked at these specific locations, but then it turns out based upon the evidence in the record that that was not the case. How is your argument that that should not show that there is a credibility problem? Well, I think as to that employment, there can be a reasonable explanation. The first job he had at the auto parts store, I mean, this was 50 years ago and even today. I mean, he could have been paid under the table. That's why, or just, you know, his employer considered him a private contractor. I understand that and I understand that some folks do have that happen. But the question is, why wasn't that a basis to say that that's a credibility problem? I guess that's the issue I have. And you mean the inference being, Your Honor, that he just made this up, Mr. Yazzie? The inference that the hearing officer used that discrepancy in determining that that's a credibility issue. Well, I can acknowledge that because it does not show up on the Social Security earnings record or he has other documentation to prove that he held that job, that that may, yeah, that is a reason to challenge his testimony on that particular job. But I don't think it's sufficient enough to not determine that there's a credibility problem. All of this testimony. No, I don't see how this impugns the integrity of his entire testimony. When we refer to credibility, we're not necessarily and I don't necessarily know that the independent hearing officer here was referring to, you know, lying. It's just that this isn't very reliable testimony and it's not credible in that sense in terms of not being accurate. OK, I mean, I can accept that. But then I guess I would go on to say he is not did not rely on this employment to prove his eligibility for relocation benefits. Counsel, isn't it true that the hearing officer considered the lack of information on the Social Security report as one part of an overall consideration of testimony that he heard and determinations to to ultimately deny your client benefits? Is that right? This is one piece. What Mr. Judge Mendoza is asking about here with respect to the Social Security report was was one thing, correct? Yes. I mean, he said in his credibility findings, he stated, you know, there's there's a discrepancy. Well, he said that he says there are great there were grave discrepancies in his testimony about the employment and also about the years he attended college. Would you agree with me that part of the hearing officer's ultimate denial of benefits was also based on implicit credibility determinations with respect to Mr. Yazi's family members? So he didn't cite to any particular he never found them to be not credible. There were no specific adverse credibility determinations made as to the family members. But he sort of generally said that they had limited credibility. Is that right? Yeah, I mean, yeah. Why why under our case law isn't that enough to remand this case? Because when we have a hearing officer that's relying on multiple things and one of those things is prohibited by our case law, that is making implicit credibility determinations as opposed to explicit adverse credibility determinations. How can we know that there was not at least some part of this decision that is that is problematic, arbitrary and capricious, a violation of the officer's duties to make adverse credibility determinations? Yes, I'm not quite. I mean, this is what we would say. I mean, he did just the blanket dismissal, the collective finding that all three witnesses had limited credibility without taking the time to address each one individually and state the specific and cogent reason why they were not credible. I'm asking this question because, well, maybe you're confused because that is part of your argument. My question is, isn't that enough to get at least the remand here? Isn't that enough? Do you have to win on all of these arguments? That's my question. No, I wouldn't know. I mean, I would think if this court finds that the hearing officer's credibility findings do not comport with this circuit's precedent as to the proper procedure to do that, that that is sufficient to amend this this case. I do think that there's more. There's it's problematic. Also, the the what he finds to tie Mr. Yazi to to the city that he went to high school there, his girlfriend went to the same high school they met in high school. He stayed with his aunt while he was attending high school. And the birth certificate of his son, which was September 15th, 1949, years ago today, showed the wife's residence as to the city. None of that is probative evidence that Mr. Yazi said he finished school. He said that he found a place to live in Tuba City in preparation for the birth of his son. Correct. He did not say that, Your Honor. Judge Collins, I do not think that that's correct. You're saying that his testimony was he found another residence besides his aunt? Where was he living at the time that his son was born on September 15th? Where was he physically present? Well, I mean, he I mean, his testimony was that he never moved in with his wife's family in Tuba City. So he while he was in Tuba City, he resided with his aunt, but his legal residence remained in coal mine. And, you know, as far as the rate, you know, I do want to say quickly just, you know, the case that we cite in our opening brief, the Mike case quotes from O'Neill's own 1990 plan update where it rejected actual residents in favor of legal residents and described actual residents where the applicant may be living temporarily. So here's what I'm looking at your post hearing brief on ER 214. And it said at the end of the spring term, it said he attended college for two semesters in the fall of 75 to spring 76. He returned home to coal mine for Thanksgiving and Christmas. At the end of the spring term, he began looking for work since his wife was expecting a baby. After a month, he found a job as a driver for the Tuba City Hospital. During the summer of 76, after he got the job, he returned to his coal mine home every chance I got. It seems clear from that that he was working and living in Tuba City in preparation for the birth of his son while still going home to coal mine every chance he got. But he was working already during the summer, correct? That is his testimony. But therefore, he was living somewhere in Tuba City while he's working in Tuba City, correct? Correct. But again, this why is it not a reasonable reading of the evidence that if you take a job in Tuba City in preparation for the birth of your son in Tuba City, where, you know, the mother of the child lives and you're working there and living there and that's what makes you a head of a household. Why isn't it reasonable to conclude that on the day the son was born and you becomes a head of household that his residence was Tuba City? Because, Your Honor, this takes us back to the whole temporarily away definition. I would be temporarily away if he gets this job in Tuba City specifically in preparation for the birth of his son in Tuba City. I mean, he he needed. Well, the the reason he got the job was he needed the income. That's what he's stating. But this doesn't mean that he's legally relocated to Tuba City because the testimony of his mother and his uncle was that it's still his plan. And that and the hearing officer on this evidence was compelled to conclude that it was still his plan even after the child was born. I'm going back to coal mine. That's where I really live. I'm sorry, Judge Collins. What's your I mean, it sounds to me that what you're saying is that even though he had a job in Tuba City was living in Tuba City, the mother of the child is living in Tuba City. The child is going to be born in Tuba City, that it was on September 15th, the day the child was born. It was his intention to return to coal mine to live. Well, Your Honor, is that your claim? My my claim is, as of that date, his legal residence remained. It would only remain coal mine and his presence in Tuba City would only be temporary if it was his intention to return to coal mine. But I don't see how the hearing office compelled on all this Tuba City evidence around September 15th to conclude, you know, he really was in his heart. He wanted to go back to coal mine. I don't see why he had to conclude that. Well, Your Honor, the the eligibility requirements don't require a showing that the applicant, once they've attained head of household through whatever means, that there's no requirement that they have to show that they are going to remain on the on the HPL indefinitely. But what matters is where it matters, where they resided on the day they became head of household, where they legally resided. Correct. And in order to say that his legal residence remained coal mine on September 15th, 1976, it must have been his intention to return to coal mine and not to stay in Tuba City. Well, I just I'm having a hard time seeing the evidence that compels the hearing officer to say, yes, I think he was going to go back to coal mine despite all this centering of his life in Tuba City. Well, the evidence, you know, the testimony, if it's credited, I mean, that the hearing officer excluded it. He never addressed it. But his mother, Mr. Yazi's mother, Julia, she testified to remembering when he would be out there with his infant working. He continued to have responsibilities at that home site. He was the oldest son, as his brother testified to. And, you know, this is a labor intensive pastoral home site. I mean, he would not give up that responsibility, you know, simply because he had to work in Tuba City. He needed income. But to the best of his ability, every chance I got, the hearing officer didn't like that phrase, but it makes perfect sense. He would be home to take care of his responsibilities. And it is important, again, you know, to recognize, I mean, this is, you know, a Native American man. His brothers in time for rebuttal. Yes. Yes, I do. All right. Thank you. OK, thank you. We'll hear next from Ms. Collier. Good morning, Your Honors, and may it please the court, Amy Collier on behalf of the United States. I'd like to start right away by addressing Judge Desai's question about the credibility finding and whether that is sufficient to require a remand in this case. I think it's true here that the hearing officer was looking at the testimony and saying that, you know, it carried limited weight in establishing plaintiff's residency in this case. But I would point out that even if you credit the testimony of the witnesses, as the hearing officer acknowledged, it was still too indefinite and vague to establish that Mr. Yazzie was actually. I think the problem that I'm having is that the hearing officer is sort of skirting his obligation to make the kinds of adverse credibility determinations, the explicit adverse credibility determinations that our court requires so that there can be adequate review. And I think what you just said, I think, perfectly describes the problem, which is that then the district court credits this as saying, well, the hearing officer gave them as much credibility, you know, that as was necessary. But we don't, you know, but really the hearing officer didn't do that. The hearing officer ultimately at the end and all of its conclusions relied on the limited credibility of these witnesses, but without ever making any sort of explicit finding that we can review on the substantial evidence standard. So I'm not, I'm struggling to see what sort of specific credibility finding would be important to make here, given the limited name. Well, I think that if you're going to use the fact that they had limited credibility to support an ultimate determination, then you need to cite to something to suggest that they had, that they were not credible. I think that that is precisely the problem, which is to be able to say they have limited credibility, but without giving the reviewing courts anything to look at, there's this sort of catch-22, and that's why we have this requirement in the first place. Well, to Judge Desai's point and to counsel's argument just before he sat down, crediting, for example, the mother's testimony about how he had additional responsibilities, but when there's this limited credibility finding as to these witnesses, so you question this, like, well, did they consider that? Was that something that was not? Was it unsupported by the evidence? Was that information not credible? That's the problem that we run into. So I think, you know, I agree that the hearing officer could have potentially provided more detailed explanations for why he was not finding that Mr. Yazzie's witnesses carried the weight in establishing his residency. But I just want to step back for a second and point out that Mr. Yazzie, the plaintiff, carries the burden to establish that he was residing on the HPL at the relevant time. I don't dispute that at all. Obviously, the applicant has the burden, but the applicant could argue, and I think does argue in this case, that he satisfied that burden by putting forward evidence through witnesses, that he had an intent to return to the HPL, that he had a legal residence, which is what his obligation and burden is to prove. And the hearing officer discounted that testimony, but without making any sort of explicit adverse credibility. So I don't think there was any testimony about his manifestations to of intent to reside on the HPL. There was testimony about. So, for example, his brother would testify that he was going to school in Tuba City, working in Tuba City, and that he his brother was commuting or was returning every weekend to the to the HPL. But that when asked directly after that, whether he would see plaintiff at the HPL, he said we would we would go traveling around a lot, not every weekend, not he was intending to reside there, not any of the indicia of intent to reside that is laid out in the regulation or in other cases, such as storing belongings there, such as other documentation establishing his residency there. I would also point out that his uncle testified that he was working in Tuba City. Again, these my understanding is that these two distances are not so far away that one can't live on the HPL and commute to Tuba City. And that's what his uncle was doing for decades. So the you know, the hearing officer heard that testimony or heard this sort of vague, insufficient testimony about how often they might see plaintiff at the HPL. And then on the other hand, was weighing it against say about where he was living when he got the job and the summer of 76. So I missed the beginning of the question. Yes. So my understanding is that he was living in Tuba City and working in Tuba City. I don't think there's necessarily anything in the hearing transcript that goes to that. I know when he was interviewed by the agency in the initial application period that the notes from that indicate that he told the hearing that told the agency that he was living with his girlfriend in Tuba City. But in terms of the testimony, I don't think there's anything establishing that. But there's nothing saying that he was commuting from Tuba City from the HPL to Tuba City. There's nothing saying that he was going home every weekend that he was keeping his belongings there. Here's one of the problems I have, which is that, you know, as you can tell from my colloquy with Mr. Malone, the strongest piece of evidence that he had shifted his residence to Tuba City was that he took a job there in the summer of 76 before his son was born and before the day he becomes head of household. However, the independent hearing officer seemed to reject that testimony because he noted that there were no Social Security earnings for 1976. So can we rely on testimony that the hearing officer rejected as not credible in order to sustain? There seems to be an internal contradiction. It wasn't credible because of the inconsistency with Social Security. But then if it's being invoked to sustain the burden that he was in Tuba City by September 15th. So the hearing officer did find that he became a full time resident of Tuba City by September 1976. That's at ER 229. The hearing officer acknowledged that the Social Security statement did not show any income for 1976 or 1977. But he's saying that the plaintiff himself claimed he was where he was living and claiming he was working there at that time. So, again, even crediting that testimony again, I think there's some dispute about whether those are not crediting that testimony. Well, I don't think that there's a specific I don't think the credibility goes to that particular job. So, for example, the credibility of a Social Security earnings statements really goes to the 1974, 1975 timeline, because as plaintiff pointed out, read this carryover sentence on 229 to 230. At that time, meaning when the child was born, applicant was a full time resident of Tuba City where he lived and claimed that he worked. And then there's a parenthetical applicant. Social Security earnings statement does not show any income for 1976 or 77. So he's simultaneously saying, I don't believe it, but he loses anyway. So I think and this is in the record, it's not in the hearing officer's decision. But the reason that there's no Social Security earnings statement for that particular job, my understanding is that it was a civil service retirement account that would not be the individual not be paying into. Do you agree with that, that that accounts for the discrepancy with respect to this? I think I think that's a possible explanation for it. And I think it's supported by the record. Then isn't that adverse credibility determination not supported by substantial evidence? The adverse credibility determination going to his 1974, 1975 timeline, which I think is still part of the key timeline. Again, he has to show that he was a resident of the HPL in both December 1974 and in September 1974. You know, even again, by his hearing officers reading of the evidence, because, you know, he believed the documents over the testimony and the documents have them in college in December of 74. And college is going to college out of town is not usually a shift of your residence and domicile. And so it's a little shaky then for December 74. But September 76, the problem is that we have this contradiction between the strongest piece of evidence is that he worked there. But I don't believe it. And now you're saying that the reasons for disbelieving you agree may have been faulty. It seems to me this whole thing needs to go back and be. So this is just too much of a two points on that. First, the temporary way of exception can apply when someone is away at college or away at work. If they intend to return back to the home site afterwards. The record here shows that he went away to college and didn't return back to the HPL. He went back to Tuba City, got a job in Tuba City, kept staying with his wife in Tuba City. When? So based on the Social Security testimony records for the auto shop job, that would have been in 1975 that he went to college. The auto shop was, I thought, in 74 and ended in November. So that's what his testimony was. But he testified that he was being paid by check. He never testified that he was being paid under the table. And the records show he has earnings from 1975. But the hearing officer did not say that that testimony, that that work took place in 75. The hearing officer finding is not on the record. The hearing officer did find that he had earnings from 1975, no earnings from 1974. And so that was a grave inconsistency in his testimony. Correct. So he has inconsistencies in the testimony, but we kind of don't seem to really know what facts the we know the ultimate conclusions. The hearing, we don't really know what facts we know. Was he really working there in September of 76 because he seemed not to believe it? Well, so this goes back to my second point, which is that the plaintiff carries the burden to establish that the evidence shows that he was a legal resident of the HPL. And what the hearing officers saw was sort of this mixed, unclear testimony that was conflicted by evidence. Some additional vague testimony that really didn't show any intent to actually reside on the HPL. Just said we saw him around and found that plaintiff did not carry his burden of establishing that he was a legal resident of the HPL at the relevant times. I don't think that the evidence compels a fact finder to say, oh, no, actually, he did carry his burden. The evidence points the opposite direction, a separate issue. I understand that there were cross motions for summary judgment. My questions really aren't going to whether or not we can determine on appeal that Mr. Yazzie was entitled to summary judgment. The question is whether or not the grant of summary judgment to the agency was appropriate given these findings by the officer that seemed very much to me like heads I win, tails you lose. I'm going to look at the record and cherry pick out the things that are helpful to support my conclusion. And the things that are not helpful I'm going to find are not credible, even if they are exactly the opposite of what I'm relying on to deny belief. It really seems like you could never meet your burden if that's the way that the hearing officer is weighing the evidence. So, again, I think the substantial evidence standard requires it says that it should be upheld if there's an adequate basis in the record. And the question is not whether we've established 100 percent that he was residing into the city at the time. The question is, is there adequate evidence in the record to say that he did not carry his burden of proving that he was a legal resident of the HPL at the relevant time? And I think that there is adequate evidence in the record, just given his deepening ties with to the city, meeting his wife, that future wife there and staying there, continuing to live there, continuing to look for work there, continuing to stay there overnight rather than commuting like some of his relatives. I think that evidence does support an adequate or is adequate to support a finding that he did not carry his burden of showing that he at the time was a legal resident of the HPL. And unless the court has any further questions, we'd ask. Thank you. Thank you, counsel. Thank you, Justice Collins. You know, I want to first take issue with one thing that counsel said that in the notes, I believe she said, of that O'Neill's attorney made when he spoke to he had a telephone conversation with Mr. Yazzie prior to the hearing. And that Mr. Yazzie said he lived with his girlfriend. Now, I believe what he said was he split his time between his girlfriend and his home in coal mine. He explicitly stated when asked his testimony at the hearing was that he did not reside with his girlfriend. They were not married. It would have meant living with their family. And there's no evidence that he transferred his temporary residence in Tuba City from his aunt's house to that of his wife. And, you know, I think, you know, it has been some of the questions from your honors that, yeah, the hearing officer here does try to have it both ways. He ties Mr. Yazzie to Tuba City through his employment that he testified to and then parathetically says that this is not, you know, this is not credible because the record, his social security record doesn't show it. And one thing I want to say is, you know, in the legislation of the Settlement Act, Congress, you know, acknowledged the United States' trust responsibility towards Native Americans and stated therein that this relocation program, because they saw that the joint use area would be separated and that people would be involuntarily relocated. And they stated that this involuntary relocation program would be carried out in an equitable, fair, and consistent manner so as to limit the adverse social and cultural and economic consequences. All right. Thank you, Counsel. I've let you go over your time. All right. Thank you. The case for this argument is submitted and we are in recess for the day.
judges: COLLINS, MENDOZA, DESAI